UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                              :

UNITED STATES OF AMERICA        :

                                              :         21 Cr. 75 (VEC)

          -  v.  -                      :

STEFAN HE QIN,                     :

                  Defendant.   :

------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING SUBMISSION


                                                             AUDREY STRAUSS
                                                              United States Attorney for the
                                                              Southern District of New York
                                                              One St. Andrew's Plaza
                                                              New York, New York 10007


Daniel M. Tracer
Assistant United States Attorney
    - *Of Counsel* -

# Contents

PRELIMINARY STATEMENT ................................................................................1
BACKGROUND ......................................................................................................1
THE SENTENCING GUIDELINES .......................................................................4
DISCUSSION ..........................................................................................................4
    Applicable Law................................................................................................5
    The Seriousness of the Offense .......................................................................5
    General Deterrence ..........................................................................................9
FINANCIAL PENALTIES......................................................................................9
CONCLUSION ......................................................................................................11

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in advance of the sentencing of Stefan He Qin ("Qin" or the "defendant"), scheduled for September 15, 2021. For years, Qin ran a high profile, multimillion-dollar hedge fund that was purportedly engaged in a profitable, low-risk strategy of earning profit by engaging in arbitrage trading of cryptocurrencies at exchanges around the world. In fact, however, Qin used that hedge fund as his own piggy bank, stealing investor money to live a lavish lifestyle and repeatedly lying to investors about what he was doing with their money. As he became desperate to keep the fraud hidden in the wake of investor redemption requests in late 2020, Qin doubled down on his fraud by trying to steal the assets of a secondary multistrategy cryptocurrency hedge fund that he also ran to pay back investors in his main hedge fund. Given the brazen nature of this scheme, the substantial losses that have ensued, and the need to deter others from serious financial crime, a substantial sentence of imprisonment is necessary and appropriate in this case.

**BACKGROUND**

The defendant is a 24-year-old Australian national who founded and controlled two cryptocurrency hedge funds, the Virgil Sigma Fund ("Virgil Sigma") and the VQR Multistrategy Fund ("VQR"). (*See* June 22, 2021 Presentence Investigation Report ("PSR"), ¶ 8). Virgil Sigma was founded in or about 2017, and purported to engage in arbitrage trading of cryptocurrencies at approximately 40 different cryptocurrency exchanges around the world. (*Id.* ¶ 9). Qin touted this strategy as market neutral and low-risk. (*Id.*). Qin exercised day-to-day control over Virgil Sigma and was responsible for creating and distributing Virgil Sigma's investor statements. (*Id.*). As of late 2020, Virgil Sigma purported to have over $90 million in assets under management from over 100 investors, including dozens in the United States. (*Id.* ¶ 10). VQR was founded in or about February 2020, and engaged in a variety of cryptocurrency trading

1

strategies that were not market neutral. (*Id.*) Although Qin was the sole owner of VQR's general partner, the day-today trading and operating activity, including the preparation of investor statements, was not conducted by Qin. (*Id.*). As of late 2020, VQR had approximately $24 million in assets under management.

Between 2017 and 2020, Qin regularly touted the profitability and success of Virgil Sigma. For example, during the relevant period, Qin reported that the fund was profitable in every month, except for March 2017. (*Id.* ¶ 11). Qin shared information about his investors' profits in statements that he prepared himself and whose accuracy Qin regularly certified to the investors. (*Id.* ¶¶ 10, 15). Qin also prepared summary fact sheets and other spreadsheets for investors that purported to summarize investor profits and some of Virgil Sigma's balances at various cryptocurrency exchanges. (*Id.* ¶ 15). Qin was also featured and agreed to be interviewed in numerous prominent media outlets including the *Wall Street Journal*, where he regularly touted the profitability and success of Virgil Sigma. (*Id.* ¶ 16).

Rather than actually engage in profitable, low-risk cryptocurrency arbitrage trading, however, Qin ran Virgil Sigma in a Ponzi-like fashion, stealing investor assets for a variety of purposes and falsifying all the above-described communications to investors and the investing public. (*Id.* ¶ 13). For example, Qin diverted millions of dollars of investor money to various investments and cryptocurrency trading platforms for purposes that had nothing to do with arbitrage trading. Some of the investments were made in Qin's name personally and involved risky, speculative forms of investment. (*Id.* ¶ 13c). Qin also diverted millions of dollars in investor money to pay off redemption requests from other investors. Qin also diverted millions of dollars to personal expenses, including hundreds of thousands of dollars to pay rent for a luxury apartment in New York City, and hundreds of thousands of dollars spent on partying and lavish entertainment. As a result of Qin's activities, by late 2021, nearly all of the investor capital that

remained in Virgil Sigma was dissipated. Virgil Sigma's liquidation – along with substantial ongoing efforts by a court-appointed receiver to locate and recover assets – are currently underway in a parallel civil enforcement action, *S.E.C. v. Qin*, 20 Civ. 10849 (LGS) (the "SEC Case").

In late 2020, Qin began to have trouble meeting certain redemptions requests by Virgil Sigma investors. (*Id.* ¶ 17). At first, Qin attempted to deflect these investors by, among other things, telling them that he could transfer their investment to VQR. (*Id.* ¶ 18). Rather than transfer the funds, Qin invented excuses for the delay of these transactions, including using falsely blaming the delays on intermediate banks. (*Id.*). Finally, as he grew even more desperate to access liquidity, in December 2020, Qin attempted to steal investor assets from VQR in order to pay Virgil Sigma investors. (*Id.* ¶ 19). Specifically, Qin directed the head trader at VQR to wind down all positions early – even though that might not maximize profits for VQR investors – so that Qin could access the cash. (*Id.*). Ultimately, Qin was only thwarted in stealing and dissipating those assets when the SEC initiated the SEC Case and obtained a court order to freeze all of the Virgil Sigma and VQR's assets.

After Virgil Sigma's assets were frozen, Qin obtained counsel and agreed to voluntarily return to the U.S. from South Korea to face both criminal charges and the SEC's enforcement action. On February 4, 2021, Qin pled guilty to one count of securities fraud pursuant to a plea agreement with the Government. As noted above, as part of the SEC Case, Virgil Sigma and VQR were put into liquidation under the auspices of a court-appointed receiver, a team at the law firm of Baker Hostetler and their forensic experts. The receiver is currently conducting an expansive, international investigation to try to locate and claw-back any investor money and return funds to investors. Qin has cooperated with that investigation, including by participating in numerous lengthy interviews with the receiver and by providing documents and electronically-

stored information to the receiver to use in its attempts to locate and recover assets. The Government expects that the receiver's work will take substantial additional time to complete.

## THE SENTENCING GUIDELINES

The Government agrees with the U.S. Probation Office on the appropriate Guidelines calculation in this case, which is also consistent with the stipulated Guidelines range in the plea agreement between the parties. Securities Fraud is covered by U.S.S.G. section 2B1.1. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven. Pursuant to U.S.S.G. § 2B1.1(b)(1)(M), 24 levels are added because the loss and intended loss exceeds $65 million, but does not exceed $150 million. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), two levels are added because the crime involved more than ten victims. Pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(iii), four levels are added because the defendant was associated with an investment adviser, namely his hedge funds. Finally, a three-point reduction is warranted for the defendant's acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b), yielding a total offense level of 34. (PSR ¶ 5). The defendant has no known criminal history. Accordingly, the recommended Guidelines range is 151-188 months of imprisonment. Through its supplement to the PSR, the Probation Office has recommended a 96-month sentence based primarily on "the defendant's non-violent, first-time offender status, and because the defendant learned of the instant investigation while oversees and voluntarily returned to the United States to face justice." (PSR at 21).

## DISCUSSION

The Government recommends that the Court impose a substantial term of imprisonment in this case. Such a sentence is necessary to meet the statutory ends of sentencing. In particular, the sentence in this case must take into account the seriousness of the offense, namely, the ways in which the defendant took advantage of numerous victims and the substantial losses suffered by these victims. A substantial sentence is also needed for general deterrence; in order to clearly

demonstrate to others that crime does not pay. A lesser term of imprisonment, and certainly a non-custodial sentence, would send the wrong message about the seriousness of the defendant's conduct and would be contrary to the sentencing goals of 18 U.S.C. § 3553(a).

*Applicable Law*

Once the Court has calculated the applicable sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a). While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines--that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Id.* at 188. "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented.").

*The Seriousness of the Offense*

The crime in this case was extremely serious and has led to real and hefty losses. The magnitude of the crime and its real-life impact can be felt palpably in the numerous victim letters that have been submitted to the Court. (*See* Victim Impact Letters, Dkt. No. 19 ("Victim Let.")). This crime was particularly egregious for numerous reasons. First, in perpetrating this fraud, the defendant preyed upon many of his own friends and acquaintances. Some of the people that lost money in this scheme were the defendant's employees who invested in the fund as well as parents of his friends who were attracted to invest with Qin based on their personal connections, either directly or through their children. These individuals were loyal to Qin and trusted him based on these relationships. Qin took advantage of these relationships when he stole from these victims

5

and deceived them for years about the truth of their investments. Moreover, after investing with Qin, many of the investors developed personal relationship where they would call or speak with Qin about their investment. The fact that Qin would continue lying to these investors' faces and take advantage of the trust they placed in him to manage their hard-earned money demonstrates a high degree of culpability that calls for serious punishment.

Second, in perpetrating this fraud, the defendant was brazen. After taking their money, Qin repeatedly lied to his victims over a multi-year period. These lies included statements each month that reflected fictious balances, numbers that Qin simply made up. Those statements even included a certification where Qin attested to the accuracy of the balances he provided. These actions further induced victims to rely on Qin and allowed him to continue his fraud. As one victim put it, "I put a few hundred thousands of hard earn[ed] money into this product (and receive[d] a statement each month stating a steady return). . . . [I cannot] believe there [are] such BAD people from the U.S." (Victim Let. at 2). The defendant even tricked relatively sophisticated victims, including, for example, a victim who worked as a trader and whom Qin deceived into thinking he ran a legitimate investing operation by seeking the victim's "advice and counsel" on structuring and setting up the fund. (*Id.* at 92). These were knowing and sophisticated lies that were intended to deceive. And the defendant was not just quietly lying to his victims. While running his fraud, the defendant regularly appeared publicly in order to tout the success and growth of his investment funds. For example, the defendant appeared in widely-read publications including the *Wall Street Journal* and other magazines aimed at participants in the cryptocurrency markets. In his *Wall Street Journal* feature, Qin told the newspaper that his fund was up 12% in January 2018, even while the defendant knew his entire fund was a house of cards and he was not executing the trading strategy he claimed to be. This article, along with

other press and media, caused investors to flock to the defendant's funds, even when he knew he was not investing their money as promised.

Third, the defendant's fraud caused real losses to people who relied on their investments with him for savings, retirements, and other life goals. The loss of their money has had a dramatic impact on their lives. This sentiment permeates the victim letters in this case. As one investor states, "I intend to use the money and build up to pay off my house mortgage . . . I do not have a job currently . . . This event has put me in high financial trouble." (Victim Let. at 2). Similarly, another investor describes, "It is a true test to describe all the losses we have suffered from Stefan Qin's fraud . . . We took cautious steps in committing to this investment because these funds are literally all my life's work that we have counted on to retire." (Victim Let. at 11). Another investor explained that "2020 cost me my job and a large portion of my retirement. It has completely changed the trajectory of my career and my life." (*Id.* at 92). Put simply, the defendant's crime had lasting and meaningful impact on his victims' lives and will saddle them with hardship for years to come.

In addition to the serious financial losses that have been inflicted, victims of Qin's crime have suffered mentally and emotionally as well. Knowing they have been cheated by someone they trusted, and having to cope with the uncertainty and loss of their financial future has taken a toll on numerous investors. One investor, for example, described having to get a second job to make up lost money and explained that the "emotional pain I suffered from the financial losses was unbearable." (Victim Let. at 85). Another investor explained, "[t]he crime impacted me financially and emotionally. I was quite distraught by the experience." (*Id.* at 90). Another victim laid bare the all-encompassing effects that this crime has had on her life, noting that it has "up-ended my life, made me homeless and destitute, and taken away my dream of having a child and starting my own family." (*Id.* at 99). These harms cannot fully be addressed through

7

sentencing, but the imposition of a substantial sentence will go a long way to restoring these victims' belief in the criminal justice system and basic fairness. A substantial sentence is necessary to show these victims (and others who observe the criminal justice system) that justice has been served.

In addition to the individual losses, the efforts that have been expended in trying to rectify the fraud here are substantial. First, as described above, a tremendous amount of funds, time, and effort are being expended by a court-appointed receiver to unravel all of the defendant's fraud and attempt to recoup assets under the auspices of the SEC Case. In the end, it is likely that whatever funds are recovered will not come close to the full amount of victim losses in this case, leaving the victims to have to deal with competing and minimal recoveries and potentially years of disputes. As Judge Rakoff has noted, "[a]n under-appreciated evil of substantial frauds [] is how they pit their victims against one another" leaving them to "squabble over who should get what." *United States v. Dreier*, 682 F. Supp. 2d 417, 418 (S.D.N.Y. 2010); *United States v. Dreier*, 952 F. Supp. 2d 582, 584 (S.D.N.Y. 2013) ("Fraud is the dysentery of crime: even after the infection is contained, the unpleasant after-effects linger interminably. Thus it is that even after a confidence man has been convicted, the victims of his fraud are often reduced to fighting among themselves over what assets remain."). Indeed, the victim letters in this case already evidence such issues being raised and hashed out among victims. (*See, e.g.*, Victim Let. at 5 (suggesting that VQR funds should also be available to Virgil Sigma investors)). This too is a serious consequence of the defendant's crime that should be taken into account in sentencing. In sum, the sentence of imprisonment must be proportionate to the high level of culpability and harm that resulted from this crime.

To be sure, the Government recognizes the significance of Qin's decision to voluntarily return to the United States shortly after learning of the investigation, to quickly face justice and

plead guilty, and his decision to meet with, and provide information to, the receiver for lengthy periods. These are laudable decisions that should also be considered at sentencing. They cast additional light on the defendant's character and are legitimate mitigating factors. Nevertheless, for the reasons set forth above, a substantial term of imprisonment remains necessary to promote the goals of sentencing.

*General Deterrence*

A substantial term of imprisonment is also warranted to promote the goal of general deterrence. The sentence imposed in this case must be sufficient to communicate to ordinary citizens that they can expect serious consequences if they engage in fraud. Even for a financial crime, simply returning the money or entering a financial judgment is not enough to deter people from committing crimes in the first place. It is the custodial element of punishment that is necessary to effectively prevent people from engaging in certain types of white-collar crime in the first place. *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence."). Moreover, the defendant is not in a position to return the money that he stole and is unlikely to have the means to return those funds in the near future. Accordingly, the custodial portion of the sentence will be the only effective way to communicate the seriousness of the consequence in this case to both the defendant and to the public at large.

## **FINANCIAL PENALTIES**

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, and under the terms of the plea agreement, the defendant should be ordered to forfeit all proceeds traceable to the offense. Specifically, the Court should enter a forfeiture order in the amount of $54,793,532.14. This amount represents the total amount of actual, out-of-pocket losses sustained by Qin's investors

based on the available information to date including investor records and bank records. This amount thus does not include any redemptions that were given back to investors (*i.e.*, it is only the amount that remained invested as of the end of 2020), paper gains that Qin reported to his investors, or the VQR money that Qin was unsuccessful in ultimately stealing. The Government will submit a proposed consent money judgment in that amount in advance of sentencing.

With respect to restitution, pursuant to 18 U.S.C. § 3663A(c)(3), and in light of the receiver's expansive and ongoing efforts in the SEC Case, the Government does not believe an order of restitution in this case would be in the interests of justice. As explained above, there are dozens of victims in this case who are located all over the world. As further explained above, funds stolen from the Virgil Sigma investors were sent to other jurisdictions and platforms around the world, including in various forms of cryptocurrency that require substantial efforts to track and trace. Many of the banking records relevant to these transactions are located overseas and may also take substantial time to obtain. Also, many of the financial records in this case (including records of investments into Virgil Sigma) involve cryptocurrency transactions and exchanges, including international exchanges, that take substantial resources and expertise to collect and analyze. The receiver, with its team of attorneys and investigators, is in the process of, among other things, verifying amounts paid to and from investors in Virgil Sigma, identifying and recovering assets that may rightfully be clawed-back by Virgil Sigma, and crafting a liquidation process to return any funds available for Virgil Sigma investors in a fair and reasonable manner. The receiver was appointed by the court (Judge Schofield) and reports back to the court and the SEC on a regular basis. The receiver has and is expected to continue providing the Court with public status reports concerning its work. (*See, e.g.*, the SEC Case, Dkt. Nos. 46 & 56). This gives the receiver's work both transparency and accountability and gives the victims in this case an appropriate avenue to keep abreast of those efforts. In addition, the receiver has provided

regular updates on its work to the Government, including concerning its efforts to locate and recover assets.

In light of the receiver's ongoing work in the SEC Case it would not be in the interests of justice for the Government to seek an order of restitution in this case. First, the receiver's work is ongoing and entering an order now would be premature and potentially inconsistent with the receiver's ultimate findings. Second, given the receiver's team, resources, expertise, and ongoing court oversight, they are better situated than the Government to set up a fair and transparent process for recovering and distributing assets to dozens of investors located around the world. As contemplated by 18 U.S.C. § 3663A(c)(3), determining complex issues of fact relating to the victim losses and how any recovered assets should be treated would needlessly "complicate and prolong" the sentencing process. Accordingly, the Court should not enter an order of restitution in recognition of the fact that victim losses and recoveries will be adequately addressed through the ongoing work of the receiver in the SEC Case.

## **CONCLUSION**

For the reasons set forth above, the Court should sentence the defendant to a substantial term of imprisonment and enter an order of forfeiture.

Dated: New York, New York
September 1, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
Daniel M. Tracer
Assistant United States Attorney
Tel. (212) 637-2329

11