KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

September 1, 2021

By CM/ECF

The Honorable Valerie E. Caproni
United States District Court
for the Southern District of New York
40 Foley Square
New York, NY 10007

*United States v. Stefan He Qin*, No. 21 Cr. 75 (S.D.N.Y.)

Stefan He Qin's Sentencing Submission

Dear Judge Caproni:

We write on behalf of our client, Stefan He Qin, who is scheduled to be sentenced before Your Honor on September 15, 2021. Mr. Qin pleaded guilty before your Honor on February 4, 2021, to one count of securities fraud. As he acknowledged in his plea colloquy, at age 20, Mr. Qin founded the Virgil Sigma Fund—a cryptocurrency arbitrage hedge fund—but used investor capital from that fund for personal expenses and investments rather than investing it in a cryptocurrency arbitrage strategy, and misrepresented the returns the fund was earning for investors, in violation of 15 U.S.C. §§ 78j(b) & 78ff. ECF 12 ("Plea Tr.") at 20-21. In December 2020, however, almost immediately after learning of the government's investigation in this matter, Mr. Qin voluntarily flew from South Korea to the United States to take responsibility for this conduct, quickly pleading guilty and expressing his profound regret for his actions and their consequences. *See id.* at 21. And since then, Mr. Qin has continued to accept responsibility and work diligently toward making amends for his mistakes, offering considerable assistance to authorities in their efforts to recover assets for investors for the past seven months.

Mr. Qin's plea agreement with the government ("Plea Agreement") includes a stipulated advisory Sentencing Guidelines range of 151 to 188 months' imprisonment. The Probation Department's Presentence Investigation Report ("PSR") recommends a variance below the Guidelines range, considering the facts that Mr. Qin is "a first-time offender who has no history of violence, and the defendant learned of the instant investigation while overse[a]s and voluntarily returned to the United States to face justice, knowing he may face a significant term of imprisonment." PSR ¶ 94. In light of these observations, Probation recommended a sentence of 96 months, plus three years of supervised release. PSR at 20. But even in making this below-Guidelines recommendation, Probation did not have available a complete view of the mitigating circumstances that make a substantially below-Guidelines sentence appropriate here, including the

[REDACTED] the letters of support submitted by Mr. Qin's family members (*see* Ex. B-D), Mr. Qin's considerable efforts since pleading guilty to assist authorities and the court-appointed Receiver to help recover investor funds.

Accordingly, we respectfully submit that a sentence of no more than 24 months would be sufficient to accomplish the aims of sentencing outlined in 18 U.S.C. § 3553, given (1) Mr. Qin's personal circumstances and characteristics, including his youth, [REDACTED] (2) the nature of his offense, including the amount of investor capital he returned and the widely-recognized overly-punitive nature of Guidelines sentences in cases like this one; and (3) Mr. Qin's prompt acceptance of responsibility and substantial efforts to redress his wrongs and self-rehabilitate. A sentence of 24 months, perhaps with an extended period of supervised release, would be sufficient but not greater than necessary to achieve the aims of punishing, deterring, and rehabilitating Mr. Qin.

## I. The Guidelines Calculations

We agree with the Guidelines range that is calculated in the PSR. Specifically, we agree that the applicable offense level is 34 and that Mr. Qin is in criminal history category I, given his complete lack of prior criminal history. PSR ¶ 15. Therefore, we agree that the Guidelines sentencing range is 151 to 188 months. We also respectfully submit, however, that a below-Guidelines sentence of 24 months is appropriate in this case.

## II. A Below-Guidelines Variance is Warranted Under 18 U.S.C. § 3553(a)

### a. Mr. Qin's Background

#### *i.* Family Background and Early Life

Stefan He Qin was born on December 17, 1996, in Canberra, Australia—the country's capital city. He is currently 24 years old. His father, Ting-Kui Qin, was born on November 2, 1957, in Guizhou Province, China, and his mother, Ping Hua He, was born on July 13, 1957, in Hunan Province, China. Stefan's parents were married in Guiyang, Guizhou Province, in China on March 1, 1983. On October 14, 1985, Stefan's older sister, Lisa He Qin, was born in Guiyang.

Mr. Qin's parents immigrated from China to Australia in 1987. Before immigrating from China, Mr. Qin's father and mother each earned bachelor's degrees from Guizhou University in Plant Protection and Horticulture, respectively, and both worked as lecturers in China. Ting-Kui Qin is an entomologist, who worked at a research lab after arriving in Australia until about 1998, when he took a job as a public servant in Canberra. He also obtained a Ph.D. in entomology from the Australian National University ("ANU") in 1993. For her part, Ms. He worked in Australia as a laboratory technician at Commonwealth Scientific and Industrial Research Organisation—the national science research agency of the Australian Government. Ms. He is presently retired. Ting-Kui Qin was the family's primary income earner during Mr. Qin's childhood and continues to work as a public servant. In 2015, Mr. Qin's parents divorced.

Mr. Qin and his older sister, Lisa, had a close relationship during his childhood. Given the eleven-year age gap between the two siblings, Lisa often took care of Mr. Qin when the two were younger. Lisa is a highly accomplished individual: she studied law at Australian National University in Canberra, and afterwards, was hired by King & Wood Mallesons, a large international law firm. She later left the legal profession to pursue a career in education, teaching children in juvenile prison through the Teach For Australia program, and ultimately obtaining a postgraduate degree in education from Harvard University on a scholarship. After completing her studies at Harvard, Lisa worked for UNICEF in Beijing, China. Lisa eventually returned to Canberra, where she currently lives with husband, James Gutteridge, whom she married in 2020.

Mr. Qin's early childhood was marked by an intense focus on education, with high parental expectations. He attended public pre-kindergarten at the Christopher Robbins school in Canberra, and attended the Turner School, a public school in Canberra for kindergarten through Grade 4. He started doing math at an early age, prompted by the encouragement and insistence of his mother. Mr. Qin's mother would obtain Chinese math textbooks, which were more advanced than the equivalent books for Australian children, and would press Mr. Qin to study them. By age three or four, he was already doing long division. And his mother's intense, and sometimes domineering and overbearing focus on Mr. Qin's educational endeavors remained a constant feature of his childhood, often straining the relationship between the two.

After Grade 4, Mr. Qin's parents enrolled him in a private school called Radford College, which is widely regarded as one of the best and most competitive schools in Canberra. Mr. Qin continued to excel academically during his childhood years, especially in math. He was offered the opportunity to skip grades (though he ultimately did not); he also participated in math competitions starting in Grade 5, achieving the highest distinction awarded in some competitions. He developed an enthusiastic interest in playing chess and aspired to one day become a professor. In his early years, Mr. Qin socialized comfortably with most of his peers. But all of that changed with the start of his early teenage years.

Around Grade 7, Mr. Qin started to experience severe bullying at school. Mr. Qin's bullies tormented and harassed him, both physically and verbally, on a frequent basis. Many of the bullies were soccer players, who would hit Mr. Qin, intentionally trip him, kick him, and mock him when he tried to join in soccer games. Starting in Grade 7, one of the ringleaders of this abuse was Taiyang Zhang, a boy who ultimately ended up playing a continuing role in Mr. Qin's life and co-founding the company known as Virgil Capital with him. When the two were children, Mr. Zhang would physically and emotionally bully and intimidate Mr. Qin at school, but in private, the two developed an intimate friendship: Their childhood homes were close to each other, and after school, despite the bullying, they would often go home together and play video games.[1]

---

[redacted]

Although Mr. Qin's relationship with Mr. Zhang improved over time, with the public bullying tapering off and the friendship remaining, other students at Radford continued to terrorize Mr. Qin at school and at home. By Grades 9 and 10, the bullying was primarily verbal, including "cyber-bullying" online. For example, his peers created Facebook groups dedicated to making fun of him and harassed him through instant messaging. [redacted]

Mr. Qin's entire secondary school experience (in Australia, Grades 7 to 10) was shadowed by the effects of this bullying. In addition to these social struggles in his early teen years, the relationship between Mr. Qin's parents—never a particularly close or loving one—continually deteriorated during this time in his life. Mr. Qin's parents argued constantly and were at times physically abusive towards each other (Lisa recalls one instance in which their mother poured boiling water on her father), with their relationship worsening significantly after Mr. Qin's mother learned that his father had been unfaithful. Both Mr. Qin and his sister Lisa were emotionally taxed and drained by this constant parental conflict.

The chaos of Mr. Qin's childhood home life extended beyond just parental conflict, [redacted]

*ii.* <u>Early Adolescence</u> [redacted]

[redacted] He began to struggle socially, occasionally coming to tears in class and experiencing awkwardness interacting with his peers, especially when it came to socializing with girls, finding himself unable to speak to them at all. As a result, Mr. Qin began to withdraw socially, immersing himself in videogames and the internet as a means of escaping his social distress and anxiety. His primary social outlet became internet fora, on which he would often engage in philosophical conversations and debates. His penchant for videogames eventually progressed to the point of obsession, as he often spent 15-16 hours per day playing games, at times playing up to 20 hours in a single day. *Id.* Indeed, as Mr. Qin grew more self-aware of his difficulties controlling the impulse to play videogames, he became concerned about his addictive tendencies. For that reason, he has wholly avoided taking any drugs, and rarely drinks any alcohol to this day.

[redacted]

[redacted]

*iii.* Senior Secondary and University Years

Although he struggled with these social and emotional challenges, Mr. Qin continued to excel in math throughout his secondary school years and senior secondary years (Grades 11 and 12). By Grade 11, Mr. Qin was also beginning to expand his academic interests to encompass other topics in science, technology, engineering, and math. For example, Mr. Qin enrolled in a university-level physics class in Grade 11, achieved the top grade in the class, and was offered an opportunity to enroll early at ANU—one of the premier institutions of higher education in the world, and the same institution his father and sister attended. Mr. Qin also participated in nationwide and international math competitions and physics competitions in Grades 11 and 12, at times earning commendations and honors. Ultimately, Mr. Qin graduated first in his class in math and third overall at Radford College. After Grade 12, he enrolled at ANU and received a merit scholarship from that prestigious institution.

Mr. Qin achieved these academic successes in spite of a very difficult home life. Around this time during his childhood, the fighting between his parents continued to escalate in frequency and intensity, and they began to sleep in separate bedrooms. These fights were an unrelenting feature of Mr. Qin's home life, making it difficult for him to focus and concentrate on his studies. Eventually, Mr. Qin learned of the marital infidelity that (at least in part) underlay these conflicts: Mr. Qin received a disturbing, expletive-laden Facebook message from the husband of his father's mistress, accusing Stefan's father of being a "cheater." This constant fighting between his parents was not only distracting, but also emotionally traumatizing—in Grade 11, Mr. Qin broke down crying in class due to the emotional strain. [redacted] Mr. Qin's pain at his parents' fighting was only heightened by the fact that he was forced to bear it alone—his sister, Lisa, had left home permanently a few years earlier.

Ultimately, the emotional strain of his parents' fights took its toll on Mr. Qin—by the time he was 18 and had enrolled in his first year at ANU in January 2015, the trauma of his parents' constant fighting made it impossible for Mr. Qin to concentrate adequately on his studies. That year, his parents decided to divorce, and Mr. Qin soon dropped out of university in March 2015, just midway through his first semester. This was Mr. Qin's first experience with academic failure, [redacted] After a few months, Lisa invited Mr. Qin to join her in Beijing, and he moved to China with her in June 2015.

In Beijing, Mr. Qin experienced a sense of independence for the first time, using his scholarship money from ANU to pay for essentials and looking for a job to earn money. He began attending networking events for start-up companies and seeking computer programming jobs and projects, some of which he undertook on an unpaid trial basis. Ultimately, Mr. Qin obtained an

internship with a company called Remitsy—a subsidiary of OKCoin, which is a large crypto-currency exchange. Remitsy was a payment service provider, through which customers could make currency transfers using Bitcoin, which ultimately enabled the company to provide a more competitive currency exchange rate (or "FX Rate") than banks could offer. Mr. Qin was tasked with building arbitrage software for Remitsy, which would permit users to purchase cryptocurrency in U.S. dollars and sell it in Chinese RMB (or vice versa). Mr. Qin was paid just one Bitcoin (at the time, worth about $60 USD) for the entire project, which he worked on for approximately six months.

After completing his internship at Remitsy, Mr. Qin decided to re-enroll in university, this time at University of New South Wales in Sydney (UNSW). UNSW was not only far from the emotional distractions of Mr. Qin's home life in Canberra, but it was also appealing for its reputation in the computer science, entrepreneurship, and start-up business fields. In January 2016, Mr. Qin embarked upon a bachelor's degree program in advanced computer science at UNSW. Mr. Qin also immersed himself in the university's entrepreneurial environment, competing in "hackathon" coding events and start-up competitions. At this time, Mr. Qin, along with a classmate, founded his first company, called Dime Payments ("Dime")—his idea was to capitalize on the favorable FX rate one could achieve using cryptocurrency to help Chinese international students in Australia pay for their university fees (in a manner similar to the payment services provided by Remitsy). With this business idea, Mr. Qin won his first startup competition, which garnered him some award money as well. With these early successes, Mr. Qin believed he had a viable business idea, and he decided to drop out of UNSW to pursue it. Nevertheless, Dime had no clients at the time and never became profitable.

Around this time, in the late spring of 2016, Mr. Qin first met Dorjee Sun—an Australian entrepreneur best known for his work developing carbon credit trading. Mr. Sun took an interest in Mr. Qin after reading about the founding of the Dime startup, and he offered to mentor Mr. Qin. For his part, Mr. Qin—who had never before met a millionaire like Mr. Sun—was overawed by Mr. Sun's business track record and personal financial success.

In the summer of 2016, after realizing that Dime was not likely to succeed, Mr. Qin decided to re-enroll in school. He applied and was accepted to the Minerva Schools at KGI—a "startup" university based in San Francisco that was just a few years old at the time. The school operates on an online platform, without physical in-person lectures, and offers students the opportunity to spend half a year in each of seven campuses located in different countries across the globe. In September 2016, Mr. Qin flew to San Francisco to start his studies at the Minerva Schools.

At the end of his first year studying at the Minerva Schools, in about April 2017, Mr. Qin obtained an internship at 500 Startups, a well-known venture capital firm in the San Francisco Bay Area. Before starting his internship in San Francisco, Mr. Qin returned briefly to Australia in May 2017. While in Australia, he reconnected with Taiyang Zhang and Dorjee Sun, and the three decided to found a company together, which Mr. Zhang suggested they call Virgil Capital. By this time, Mr. Qin's erstwhile bully, Mr. Zhang, had started his own, relatively successful web design company and dropped out of university to pursue it. Mr. Zhang was to be responsible for helping

with some of the coding, while Mr. Qin was to be the face of the business, and Mr. Sun was a somewhat silent investor and backer.

Mr. Qin returned to San Francisco to begin his internship around June 2017, but he continued to work on this new startup company at the same time. Ultimately, his internship ended early, due to a scandal at the company involving allegations of sexual harassment leveled against the CEO, and Mr. Qin redoubled his focus on his own startup company.

Around the same time, at age 20, Mr. Qin also began his first romantic relationship with a classmate at Minerva Schools named Jennifer. Up until that point, Mr. Qin had experienced intense social anxiety around girls and had difficulty forming platonic or romantic relationships with them. At Minerva Schools, Mr. Qin intently pursued a relationship with Jennifer, and the two began dating in June 2017. Unfortunately, the relationship soon grew toxic, but Mr. Qin did not have prior romantic experience against which to accurately assess these problems. Jennifer was highly ambitious, and Mr. Qin internalized a desire for financial success from his relationship with her. Despite the fact that they often fought, the two began living together after dating for just a month and a half. Ultimately, the relationship ended in a traumatic manner a few months later, as Jennifer cheated on Mr. Qin while he was living in South Korea. After the breakup, Mr. Qin's aspirations for financial success intensified, as he desired to prove to Jennifer that she should not have ended their relationship, especially in this deeply hurtful way.

Mr. Qin started his next semester at Minerva Schools in September 2017, but this time from the school's campus in Seoul, South Korea. He increasingly came to focus on exploring cryptocurrency arbitrage trading, rather than studying, and grew distracted from school in general. The situation only worsened after the traumatic end of his first (and only) romantic relationship. Ultimately, by the end of 2017, he had resolved to drop out school once more, and formally ended his educational pursuits at the Minerva Schools in January 2018. From this point forward, Mr. Qin's sole focus was growing and developing his company, Virgil Capital.





**b. Nature and Circumstances of the Offense**

When Mr. Qin was 20 years old, he founded the Virgil Sigma Fund ("Sigma"), a cryptocurrency investment fund that purported to employ a trading algorithm to capitalize on arbitrage opportunities in the cryptocurrency market. Sigma was marketed as extremely successful, reporting investor gains every month except one from its inception to the end of 2020, with returns often in the double digits, at times as high as 35.5% and 48.7%. This record of success was not accurate. Mr. Qin controlled Sigma, and instead of investing Sigma assets in a cryptocurrency arbitrage strategy, Mr. Qin used investor capital to pay for personal expenses and investments, resulting in the dissipation of Sigma investor capital. At the same time, Mr. Qin prepared monthly investor statements, marketing materials, and other documents, reporting extremely high gains for Sigma investors and hiding the dissipation of Sigma assets. Mr. Qin knew that this conduct was wrong, and ultimately hoped to find a way out and to make his Sigma investors whole.

In February 2020, Mr. Qin founded the VQR Multistrategy Fund ("VQR"), which employed a variety of cryptocurrency trading strategies at the direction of a Head Trader and other investment professionals, rather than Mr. Qin himself. Mr. Qin intended that VQR would run

legitimately and that the expected successes of the VQR fund would generate investor returns sufficient to return funds to his original investors.

The situation unraveled in 2020 when Mr. Qin ran into trouble meeting redemption requests from Sigma investors (though he had previously succeeded in meeting redemption requests when investors withdrew money earlier in the life of the fund). Although at first, Mr. Qin attempted to access VQR investor capital to pay Sigma redemption requests, this strategy was unsuccessful, ultimately leading to the intervention of the U.S. Securities and Exchange Commission ("SEC") and the present criminal proceedings.

**c. Post-Offense Conduct and Acceptance of Responsibility**

In December 2020, Mr. Qin learned of the U.S. government's investigation into his conduct, and on December 22, 2020, the SEC filed an emergency motion for an asset freeze against Mr. Qin and five entities related to the Virgil funds ("Virgil Entities"). *See SEC v. Qin*, No. 20 Civ. 10849 (S.D.N.Y.) (Schofield, J.). A few days later, before the end of Christmas, Mr. Qin decided to assume full responsibility for his actions and to cooperate fully with the SEC and U.S. Attorney's Office to mitigate the harm caused. Accordingly, Mr. Qin voluntarily flew on January 1, 2021 from Seoul, South Korea to New York City to surrender to law enforcement and face the consequences of his actions.

To that end, after arriving in the United States, Mr. Qin appeared *pro se* in the SEC action and stipulated to the injunctive relief requested by the SEC, including an asset freeze against Mr. Qin and the Virgil Entities. *See id.*, ECF 26. Two weeks later, on January 21, 2021, the Court appointed a Receiver over the Virgil Entities pursuant to a stipulation between the SEC and Mr. Qin. *Id.*, ECF 29, 31. And from that point onwards, Mr. Qin has spent an extraordinary amount of time working with the Receiver, the SEC, and the U.S. Attorney's Office to assist their efforts to recover assets on behalf of his investors. Even before Mr. Qin pleaded guilty, he met voluntarily with the U.S. Attorney's Office, SEC, and Receiver for approximately three hours on January 26, 2021. Following that meeting, Mr. Qin provided the Receiver with access to all data in his possession relating to the funds, including by surrendering his personal laptop and cell phone and providing log-in credential to access various accounts containing relevant communications. From that point forward, Mr. Qin has continued to do everything is his power to assist the Receiver's efforts, meeting with the Receiver almost every week, usually for at least three hours, for a total of over 60 hours across more than 20 meetings. In an effort to reverse the harms he caused, Mr. Qin continued to make personal sacrifices to help the Receiver recoup as much money as possible for investors, vacating his apartment and spending over five hours in one day cooperating with the Receiver to create an inventory of his belongings and voluntarily surrendering anything of value to the Receiver for liquidation. *See id.*, ECF 71 at 7 ("The Receiver Team has conducted a review and inventory of personal assets that were in Qin's custody and has taken physical custody of certain assets and created an accounting of Qin's assets.").

Mr. Qin's efforts to assist the Receiver in recovering assets have been fruitful thus far. The Receiver has used the information gained in the 20 interviews of Mr. Qin "to gain information about the [Virgil] Entities' business operations and the existence and location of potential Receivership Property." *Id.* at 5. Mr. Qin has assisted the Receiver in contacting third parties who

may have information or personal control of Receivership, and at times, has conducted outreach to such individuals on the Receiver's behalf.

The information Mr. Qin has provided during these interviews has assisted the Receiver in "successfully assert[ing], negotiat[ing], and settl[ing] claims [against third parties] to significant Receivership Property in the form of both U.S. dollars and cryptocurrencies." *Id.* at 7. For example, based in part on information gathered during interviews with Mr. Qin, the Receiver initiated an action to recover $1.7 million from Justin Ledbetter, a former senior officer at Virgil Capital who had contemporaneous awareness of certain wrongful conduct regarding the Sigma Fund. Mr. Qin further assisted the Receiver in these asset-recovery efforts by providing a declaration in support of the Receiver's action against Ledbetter. In short, with Mr. Qin's cooperation and support, the Receiver has taken custody of Receivership property in the form of third-party assets and is in the process of recovering further assets. *See id.* at 7-8.

**d. A 24-month Sentence Appropriately Reflects Mr. Qin's Culpability and is Sufficient to Deter Future Criminal Activity**

Pursuant to Section 3553(a)(1), a sentence must be "sufficient, but not greater than necessary," to provide "just punishment for the offense"; to "protect the public" and "deterrence to criminal conduct"; and to provide "needed educational or vocational, medical care, or other correctional treatment" to the defendant. 18 U.S.C. § 3553(a)(1). Here, a 24-month sentence is sufficient in light of (i) Mr. Qin's personal circumstances and characteristics; (ii) the circumstances of Mr. Qin's offense; and (iii) the interest in protecting the public and deterring future criminal activity.

*i. Mr. Qin's Personal Circumstances and Characteristics*

Mr. Qin's personal circumstances and characteristics weigh in favor of a reduced period of incarceration.

*1. Mr. Qin's Youth*

First, Mr. Qin's sentence must account for his young age. Mr. Qin is just 24 years old. When he founded the Virgil Sigma Fund, he was only 20 years old. Research in developmental psychology has long made clear that this life stage of "emerging adulthood"—generally defined as "the transitional period between approximately ages eighteen and twenty-five"[4]—represents a critical developmental stage, marked by an increase over time in "stability," and "self constraint, moving away from impulsive behavior" and high-risk behavior "to greater self-control, demonstrating more reflective, deliberate and planful behavior."[5] Neuroscientific research accords

[4] Clare Ryan, *The Law of Emerging Adults*, 97 WASH. U. L. REV. 1131, 1134 & n.8, 1141 (2020) (Emerging adulthood is a "transitional age, where education and relationships are central features, and in which a person's full capacities have not yet crystallized.").

[5] Jeffrey Jansen Arnette et al., DEBATING EMERGING ADULTHOOD: STAGE OR PROCESS 16 (2011) (ebook) ("[F]rom late adolescence through early adulthood, most people become less emotionally labile, more responsible, and more cautious."); Emily Buss, *What the Law Should (and Should Not) Learn from Child Development Research*, 38 HOFSTRA L. REV. 13, 39 & n.119 (2009) ("Much of the developmental research suggests that the qualities highlighted

with these social scientific findings about emerging adults like Mr. Qin: "Researchers and psychologists have discovered that the brain continues to develop" until "much later than previously thought," and "is not fully formed until the early twenties"; in fact, "[s]ome studies place the age of complete development at age twenty-five."[6] And courts, legislators, and other institutional actors have increasingly come to recognize the significance of ongoing cognitive development during emerging adulthood to criminal justice issues and at sentencing in particular.[7]

Mr. Qin's faculties of impulse control and self-restraint were therefore not fully developed when the offense began, and as he emerges into early adulthood, he will only grow more responsible and stable, as confirmed by the prudence and fortitude he demonstrated in promptly accepting responsibility and attempting to right his wrongs by working closely with authorities for the past nine months. In short, the entirety of the offense conduct took place during a critical, transitional period in Mr. Qin's social and psychological development, between ages 20 and 23. Social science and neuroscience research make clear that during these ages Mr. Qin's faculties of impulse control and judgment were not fully realized and solidified, which diminishes both his culpability and likelihood of recidivation, even if it does not excuse the gravity of his conduct. Mr. Qin's sentence should account for his youth during the offense.

2. *Mr. Qin's Childhood* [redacted]

[redacted] As described above, Mr. Qin was the victim of vicious physical and emotional bullying as a child, particularly during his middle school years. *See* PSR ¶¶ 51, 62. Mr. Qin suffered physical and emotional abuse from peers during childhood, [redacted] And instances of parental unfaithfulness exposed Mr. Qin

---

by the [Supreme] Court, described together as psycho-social immaturity, continue to apply to individuals into their twenties, even mid-twenties or beyond," including during the "distinct developmental phase of 'emerging adulthood,' from eighteen to twenty-five, during which much identity formation occurs and certain high-risk behaviors are at their peak" (quoting Jeffrey Jensen Arnett, *Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties*, 55 AM. PSYCHOL. 469, 474-75 (2000))).

[6] Kevin Lapp, *Young Adults & Criminal Jurisdiction*, 56 AM. CRIM. L. REV. 357, 358 & n.8 (2019) ("MRI studies show that the adolescent brain is not an old child brain or a half-baked adult brain, but a unique entity characterized by changeability, with the prefrontal cortex, which controls impulses, not maturing until the twenties" (citing Jay Giedd, *The Amazing Teen Brain*, 312 SCI. AM. 32, 34 (June 2015))).

[7] *Id.* at 358-59 & n.19 (citing *Miller v. Alabama*, 567 U.S. 460, 489 (2012) (prohibiting mandatory life-without-parole sentences for juvenile offenders)); *Graham v. Florida*, 560 U.S. 48, 79 (2010) (prohibiting life-without-parole sentences for non-homicide offenses committed by juveniles); *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (prohibiting death penalty for juvenile offenders).

directly to further emotional trauma, including his receipt of an abusive Facebook message from the husband of his father's mistress.





*3. Recidivation is Unlikely*

Third, recidivation is extremely unlikely in light of Mr. Qin's personal characteristics, confirming that a substantially below-Guidelines sentence of 24 months is appropriate.

As an initial matter, Mr. Qin's complete lack of any past criminal history makes the likelihood of recidivism low. *See* PSR at 21 (noting "defendant's non-violent, first-time offender status"); U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 5 (2016) ("A federal offender's criminal history [is] closely correlated with recidivism rate . . . [e]ach additional criminal history point [is] generally associated with a greater likelihood of recidivism."); *United States v. Cosimi*, 368 F. Supp. 2d 345, 359 (S.D.N.Y. 2005) (noting that defendant's "lack of criminal history," among other things, "indicate[d] that he presents a low danger of recidivism"); *United States v. Smith*, 321 F. Supp. 3d 405, 409 (E.D.N.Y. 2018) (same).

Furthermore, Mr. Qin's genuine remorse for his conduct—as exemplified by his commitment since his arrest to working with authorities to assist in the recovery of investor assets—further evidences the unlikelihood of recidivation and validates the appropriateness of a substantially below-Guidelines sentence. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 315 (S.D.N.Y. 2020) (granting sentence reduction based in part on "substantial evidence of [prisoner's] remorse in the letters from those who know him best"); *United States v. Jones*, No. 10 Cr. 905, 2020 WL 6131252, at *2 (S.D.N.Y. Oct. 19, 2020) (noting importance "at the time of sentencing" of "genuine remorse" and "efforts at self-rehabilitation"); *United States v. James*, No. 08 Cr. 681, 2011 WL 1671022, at *3 (E.D.N.Y. May 3, 2011) (defendant's "remorse for his crimes," among other factors, made it less likely that he would recidivate). In fact, during the period since he returned to the United States to take responsibility for his actions, Mr. Qin has not only worked diligently with authorities, but he has also succeeded in drastically curtailing the compulsive behaviors underlying his psychopathology, including by reducing his gaming use and wholly abstaining from engaging with escorts. *See* Ex. A at 42. Mr. Qin's improvement in controlling his addictive tendencies towards gaming and sexual behaviors, coupled with his dedication to assisting the Receiver in its mission to recover investors assets, confirms that, with adequate treatment and

support, Mr. Qin can overcome his psychological conditions, abstain from destructive behaviors, and channel his considerable talents toward constructive ends.[9]

Finally, in taking responsibility for his conduct and working to remedy his mistakes, Mr. Qin has the support of his family, *see* PSR ¶ 57; Ex. B-D, which "speak[s] to his character and, importantly . . . a very decreased likelihood of recidivism going forward." *See United States v. Pena*, 459 F. Supp. 3d 544, 547 (S.D.N.Y. 2020) (quoting conclusion of sentencing court that defendant's "substantial ties to his family," among other things, demonstrated decreased likelihood of future recidivism); *United States v. Jones*, No. 13 Cr. 654, 2015 WL 3484466, at *5 (S.D.N.Y. June 2, 2015) (letters of support from friends and family evidenced that defendant had "a life and a community to return to, and a good chance at not recidivating").

Considering Mr. Qin's personal circumstances, a 24-month sentence is sufficient but not greater than necessary to accomplish the goals of sentencing.

*ii. The Nature and Circumstances of the Offense*

A below-Guidelines sentence of 24 months adequately accounts for "the nature and circumstances of [Mr. Qin's] offense." 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3553(a)(2)(A). Mr. Qin has acknowledged his responsibility for the offending conduct, expressed his deep remorse, and taken action to rectify his mistakes to the best of his ability—all out of recognition of the seriousness of the offense. But with that said, it is widely recognized that in securities fraud cases, especially those with loss amounts comparable to the present circumstances, the Sentencing Guidelines drastically "overstate[] the seriousness of [the] offense." *United States v. Rivernider*, 828 F.3d 91, 111, 114 (2d Cir. 2016); *see also* Sentencing Transcript at 23:2-7, *United States v. Faibish*, 12 Cr. 265 (E.D.N.Y. March 10, 2016) (Vitiliano, J.) ("[A] whole host of judges . . . have said so publicly and scores of others . . . have . . . grumbled about it privately. . . . [T]he guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table." (as quoted by Robert J. Anello & Richard F. Albert, *Rise of ABA Task Force's 'Shadow Sentencing Guidelines,'* 25 N.Y.L.J. (Apr. 5, 2016))).

*United States v. Caspersen*, No. 16 Cr. 414 (S.D.N.Y.), in which the defendant ultimately received a substantially below-Guidelines sentence in a case involving similar conduct [redacted] is particularly instructive in this regard. *See* Sentencing Transcript at 80 ("Caspersen Tr."), *United States v. Caspersen*, No. 16 Cr. 414 (S.D.N.Y. Nov. 4, 2016) (Rakoff, J.) (noting many "problems with the guidelines," including "their irrationality"; "their draconian [and] far too punitive approach to all crimes," including "white collar crimes"; "their very real responsibility for . . . mass incarceration"; and "the fact that they regard sentencing as an exercise in bean counting, as opposed to one of the most difficult tasks that . . . judges have to undertake"). In that case, Mr. Caspersen pleaded guilty to wire fraud and securities fraud based on conduct consisting of a "a Ponzi-like scheme to defraud more than a dozen investors, including

[9] Indeed, since pleading guilty in this action, Mr. Qin has spent many hours volunteering with City Harvest, a food rescue organization, in an effort to direct his time towards productive ends, rather than giving to his aforementioned compulsions.

his close friends, family members, and college classmates, by falsely claiming that their funds would be used to make secured loans" that would earn "an annual rate of return of 15 to 20 percent." *Caspersen*, No. 16 Cr. 414, ECF 32 ("Caspersen Govt. Mem.") at 3—all on a "practically riskless" basis. *See id*., ECF 29 ("Caspersen Sentencing Mem.") at 13.

In Mr. Caspersen's case, Judge Rakoff observed that Mr. Caspersen suffered from a "very real gambling disorder, which . . . very seriously impacted his exercise of rational control and rational decision making." Caspersen Tr. at 81-82. *See supra* at 12. The loss amount attributable to Mr. Caspersen's conduct was likewise similar, ranging into the tens of millions of dollars. And although the parties in that case stipulated to a loss figure of "approximately $36 million," the government nevertheless maintained that loss figure was understated, perhaps by as much as $110 million in solicited (but unrealized) investments. Caspersen Gov't. Memo at 11-13.

Finally, the sentencing ranges under the Guidelines are identically draconian in *Caspersen* and here. *Compare* Caspersen Govt. Memo at 1 (151 to 188 months) *with* PSR ¶ 5(C) (same). Indeed, as Judge Rakoff observed, the "guideline range of 15 years or so is absurd." Caspersen Tr. at 81. Signaling agreement with that assessment, in both *Caspersen* and the present matter, the probation officer recommended a downward variance of about fifty percent. *Compare* Caspersen Tr. at 81 *with* PSR at 20. And in *Caspersen*, Judge Rakoff varied even further below the Guidelines, imposing a sentence of 48 months. Caspersen Tr. at 82.

Like in *Caspersen*, given the draconian Guidelines range applicable to the conduct in question, a substantially below-guidelines sentence is appropriate here. And in light of Mr. Qin's particular circumstances and characteristics, it is appropriate to vary even further below the guidelines. Unlike Mr. Caspersen—who was a graduate of Princeton University and Harvard Law School with a decade of experience working in the private equity industry at the time his offense began—Mr. Qin's offense began at the cusp of adulthood, after he had dropped out of university. *See supra* at 7, 10-11. Accounting for the extra vulnerability and instability attributable to his youth and trauma history, a 24 month sentence is appropriate for Mr. Qin.

It bears further emphasis that, in accord with the observation of Judge Rakoff and others that the Guidelines ranges in cases like this are often "absurd," Caspersen Tr. at 81, judges in this Circuit have at times turned to the so-called "Shadow Guidelines," issued by a task force (including

several judges from this district) of the Criminal Justice Section of the American Bar Association, as an alternative and more reasonable guide to sentencing in such cases.[10]

The ABA Guidelines call attention to several aspects of the offense conduct here that warrant a substantial downward variance. As to Mr. Qin's culpability, the ABA Guidelines suggest consideration of, *inter alia*, "the defendant's motive" and "whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense." ABA Guidelines at 1. Accordingly, it bears emphasizing that Mr. Qin took steps to attempt to mitigate the harm from his conduct, even before it came to light: Starting in late 2019, when he founded the VQR Multistrategy Fund, Mr. Qin intended to and did develop VQR into a legitimately profitable operation, with the ultimate goal of earning high enough returns to regain, and eventually repay, the losses of Sigma investors.[11]

What is more, throughout the life of the Virgil Sigma Fund, Mr. Qin returned significant funds to investors—according to the government's analysis, for example, during the life of the fund, Mr. Qin returned approximately fifty percent of the principal originally contributed by Sigma investors. *Cf. United States v. Snelling*, 768 F.3d 509, 515 (6th Cir. 2014) (holding the district court erred "when it declined to reduce the loss figure by the value of the payments made by Snelling to his investor victims in perpetuating his Ponzi scheme."); *United States v. Nelson*, 774 F.3d 1104, 1106 (7th Cir. 2014) ("[T]he loss attributable to mail fraud excludes money obtained by deception but then returned before the crime was detected."). In other words, Mr. Qin's sentence should account for the substantial sums of money he returned to investors.[12]

Mr. Qin's culpability level must also account for the nature and scope of his role in the offending conduct. Mr. Qin was the founder of Virgil Capital and initiated the offending conduct himself, and for that, he takes full responsibility. But at the same time, he was not the sole actor to knowingly benefit from the fraudulent conduct; indeed, other more experienced and sophisticated participants at times took advantage of Mr. Qin's youth and immaturity in an attempt to themselves profit from Mr. Qin's offending conduct. Most notably, Justin Ledbetter—the former Head of Business Operations for Virgil Capital and the Sigma Fund, and Chief Operating Officer of VQR—repeatedly expressed his suspicions to Mr. Qin that Virgil Capital was operating fraudulently, encouraged Mr. Qin to take actions to obscure any illegal activities, personally took

[10] *See* ABA, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf (hereinafter "ABA Guidelines") (propos[ing] [a] federal sentencing guideline to effectuate" certain "reforms needed in the sentencing of federal economic crimes"); *see also* Anello & Albert, *supra* (collecting cases applying the ABA Guidelines).

[11] In hindsight, Mr. Qin recognizes that this strategy was inherently naive and that he was never likely to ultimately attain his goal of earning back his debt to Sigma investors through VQR's gains. With that said, the unrealistic optimism that underlaid this plan is also symptomatic of Mr. Qin's inability at that young age to maturely consider his actions and the magnitude of the potential consequences.

[12] The court may consider the value of the funds Mr. Qin returned to investors for purposes of the § 3553(a) factors, regardless of whether "victim money returned to a victim as part of a Ponzi scheme should be excluded from loss" when formally calculating the Guidelines Range. *See United States v. MacCallum*, No. 15 Cr. 204, 2018 WL 2999907, at *9 (W.D.N.Y. June 15, 2018), *aff'd and remanded*, 821 F. App'x 11 (2d Cir. 2020).

measures himself to "not document" certain activities, and continuously and systematically communicated to investors information about the Sigma Fund that Ledbetter himself believed were false and misleading. And Ledbetter ultimately extracted significant profit from his involvement in Virgil Capital, including by negotiating and receiving a $1.7 million payout linked to his equity stake in the fund. Unlike Mr. Qin, however, youthful impulsivity and ignorance played no part in Ledbetter's wrongdoing: Ledbetter was in his mid-thirties and was working at 500 Startups in 2017 when he first met Mr. Qin, who was interning at that company at the time. The power dynamic at play in this relationship and Ledbetter's conduct in knowingly perpetuating fraud partially abate Mr. Qin's level of culpability and should be taken into account.

Next, the ABA Guidelines also emphasize the importance of victim impact, including, *inter alia*, the vulnerability of the victims. ABA Guidelines at 5. Without discounting the fact that certain Virgil Sigma investors were individuals who entrusted Sigma with personally significant amounts of capital, many of the largest investors in Sigma were sophisticated institutional investors with experience in emerging cryptocurrency market. Given the extremely high returns and the near perfect performance record contained in the Virgil Sigma Fund reports, *see* PSR 11, ECF 11-1, *SEC v. Qin*, No. 20 Civ. 10849 (S.D.N.Y Dec. 23, 2020) (reporting cumulative returns of 2811% over the life of Sigma), the level of sophistication of many of the investors should be considered in weighing the impact of the offense on the victims.

In light of these considerations, for Mr. Qin, like Mr. Caspersen, "no purpose will be served by letting him rot in prison for years on end." Caspersen Tr. at 82.[13] A substantially below-Guidelines sentence will suffice.

*iii. Deterring Criminal Conduct and Protecting the Public*

A 24-month sentence is sufficient to protect the public and deter future criminal activity. Mr. Qin not only acted promptly to fully accept responsibility for his mistakes, *see* PSR ¶¶ 25-26, but his conduct since his guilty plea has demonstrated a strong commitment to rectifying his errors and rehabilitating himself. *See* § 3553(a)(2)(A). Mr. Qin's acceptance of responsibility and commitment to making amends began when he learned of the government's investigation and then quickly chose to return voluntarily to the United States to cooperate with investigators and surrender to authorities in February 2021. *See* PSR ¶¶ 22, 94. Shortly thereafter, Mr. Qin pleaded guilty before your Honor, fully accepting responsibility for his actions. And since then, Mr. Qin

[13] Pursuant to the Plea Agreement, Mr. Qin agreed to forfeit any proceeds traceable to the offense to which he pled guilty. *See* 18 U.S.C. § 982(a)(1)(C); 28 U.S.C. § 2641; ECF 2 ¶ 15. The Plea Agreement also notes that after determining Mr. Qin's ability to pay, the Court may impose a fine of $35,000 to $350,000 pursuant to U.S.S.G. § 5E1.2. (The PSR states that the statutory maximum fine is $5,000,000, PSR ¶ 79.) But as the PSR suggested, Mr. Qin will not be in a position to pay a fine on top of forfeiture and restitution in this case. *See* PSR ¶ 26 and p. 22; *see also U.S. v. Rattoballi*, 452 F.3d 127, 139 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. U.S.*, 552 U.S. 85 (2007) (whether to impose a fine is discretionary after *United States v. Booker*, 543 U.S. 220 (2005), so long as the district court considers the § 3553(a) factors and standards outlined in 18 U.S.C. §§ 3571 and 3572); *see also* U.S.S.G. § 5E1.2, cmt. 3 (noting that "determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine" and the fact that an indigent defendant is represented by assigned counsel is a "significant indicator[] of present inability to pay any fine").

has demonstrated an unflagging commitment to rectifying the consequences of his mistakes and mitigating the harm to his former investors.

Since the beginning of March, he has met nearly every Friday for approximately three hours with the SEC and Receiver appointed in the related civil action before Judge Schofield, *SEC v. Qin*, 20 Civ. 10849 (S.D.N.Y.), sometimes joined by the U.S. Attorney's office. To date, Mr. Qin has spent over 60 hours attending such meetings. The sole purpose of those meetings is for Mr. Qin to relay information, review documents, answer questions, and provide technical assistance to the Receiver, all towards the end of recovering funds for harmed investors. And in addition to these weekly three-hour meetings, Mr. Qin has dedicated countless more hours to preparing for those meetings, gathering information and documents, and responding to inquiries from the Receiver. Mr. Qin's commitment to the Receiver's mission of recovering assets for the harmed investors has been unflagging, and has predominated over virtually every aspect of his life for the better part of a year. For example, just a few months ago, before vacating his prior residence, Mr. Qin spent hours with the Receiver's consultants, cooperating with them in creating an inventory of his belongings and voluntarily surrendering anything of value to the Receiver for liquidation. *See SEC v. Qin*, ECF 71. And with his assistance, the Receiver has not only taken custody of these assets of value, but has also succeeded in recovering significant Receivership Property in U.S. dollars and cryptocurrencies from third parties. *See id.* During these meeting, the Receivership team has repeatedly expressed that Mr. Qin's assistance is in invaluable to them in executing their mission of recovering assets for former investors.

In short, Mr. Qin has worked diligently for months to do everything possible to help the Receiver understand the nature of what occurred and to assist the Receiver in recovering funds for investors.

* * *

Mr. Qin is a young man with great intellectual potential and talent, who has faced significant emotional trauma and psychological struggle to this point in his life. Perhaps seeking to ameliorate his emotional pain, Mr. Qin chased financial success, and between the ages 20 and 24, his ambitions got the best of him, leading him to make a series of bad decisions relating to the founding and management of the Sigma and VQR funds. But since then, Mr. Qin has shown tremendous growth and maturity, taking full responsibility for the harm his actions caused investors by returning to the United States voluntarily and quickly pleading guilty. What is more, Mr. Qin has gone to great lengths to assist the authorities and the Receiver in remedying those harms by recovering funds. A 24-month sentence is sufficient to achieve the aims of punishment and deterrence, without wholly spoiling Mr. Qin's considerable potential to rehabilitate himself and productively contribute to society in the future.

Respectfully submitted,

Sean Hecker
Shawn G. Crowley
Louis W. Fisher

*Attorneys for Stefan He Qin*

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
shecker@kaplanhecker.com
scrowley@kaplanhecker.com
lfisher@kaplanhecker.com

cc: Counsel of Record (by CM/ECF)